No. 95-2180

United States of America,      *
                               *
               Appellee,       *
                               *  Appeal from the United States
        v.                     *  District Court for the
                               *  Southern District of Iowa.
Adrian Ward Rogers,            *
                               *
               Appellant.      *


              Submitted:  November 14, 1995

                Filed:  January 9, 1996


Before BEAM, HEANEY, and MORRIS SHEPPARD ARNOLD, Circuit Judges.


HEANEY, Circuit Judge.


     Adrian Rogers appeals his convictions by a jury of bank
robbery and the use of a firearm in the commission of a felony in
violation of 18 U.S.C. § 2113(a)-(b) and 18 U.S.C. § 924(c),
respectively.  We affirm.


                     I.  BACKGROUND


     On November 19, 1993, Rogers was indicted by a grand jury for
the robbery of the United Security Savings Bank of Davenport, Iowa
and for the use of a firearm during the commission of the offense.
The district court scheduled Rogers' arraignment in the unusual
location of the courtroom of the Polk County Jail because Rogers
refused to submit to a strip-search, a prerequisite for
transportation to the federal courthouse.  At the arraignment,

Rogers' counsel was informed that Rogers would not leave his cell. With the court's permission, Rogers' counsel went up to the cell to inform Rogers of the purpose of the arraignment and the importance of his presence; Rogers told his counsel to proceed without him. Rogers' counsel returned to the courtroom and appeared on behalf of his client. He did not request a continuance. The district court found that Rogers had waived his right to be present and accepted a "not guilty" plea entered on Rogers' behalf. No objection was made to this procedure at the arraignment or at trial.

After the jury had been impaneled and sworn for his trial, Rogers filed a motion to quash the venire from which the jurors had been drawn, challenging the constitutionality of Iowa's jury-selection process. Rogers' motion was denied. On March 1, 1995, the jury found Rogers guilty of both the robbery and the firearms offense. The court sentenced him to eighty and sixty months imprisonment, respectively, to run consecutively and in addition to a 240-month term imposed for a prior drug offense. His total sentence was 380-months imprisonment.

## II.  DISCUSSION

Rogers raises four issues on appeal:  1) the constitutionality of Iowa's jury-selection plan, 2) his absence at his arraignment, 3) the identification procedures used at trial, and 4) the sufficiency of the evidence for his convictions.

## A.    Iowa Jury-Selection Plan

Although we affirm Rogers' convictions, we do so reluctantly with respect to Rogers' challenge of the Iowa jury-selection plan. We recognize that we are bound by a previous decision by our court, United States v. Garcia, 991 F.2d 489, 491 (8th Cir. 1993), which held that the present Iowa plan withstands constitutional scrutiny. Nevertheless, we feel compelled to discuss our concerns on this

2

issue and to encourage the court en banc to reconsider <u>Garcia</u> on this appeal.

Rogers contends that the Iowa jury-selection plan violated his Sixth Amendment right to be tried by a jury made up of a fair cross-section of the community. In the Southern District of Iowa, prospective jurors are selected from a master jury wheel, which is filled every four years with names from voter registration lists or lists of actual voters. At Rogers' trial, eighty-nine jurors were summoned for jury selection; all eighty-nine were white. At oral argument, Rogers' counsel urged our court to consider the difficulty of convincing an African-American client that the system that produced this jury pool is fair. Public confidence in the fairness of the criminal justice system, with respect to community participation in jury trials, is a concern the Supreme Court explicitly recognized in <u>Taylor v. Louisiana</u>, 419 U.S. 522, 530 (1975).

In <u>Garcia</u>, our court recognized that the Sixth Amendment guarantees a criminal defendant a jury made up of a fair cross-section of the community. 991 F.2d at 491 (citing <u>Taylor v. Louisiana</u>, 419 U.S. at 530). For a defendant to establish a prima facie violation of the constitutional fair cross-section requirement, he must show:

> (1) that the group alleged to be excluded is a `distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

<u>Id.</u> (citing <u>Duren v. Missouri</u>, 439 U.S. 357, 364 (1979)). While recognizing African Americans constitute a distinctive group, <u>id.</u> (citing <u>Peters v. Kiff</u>, 407 U.S. 493 (1972)), our court in <u>Garcia</u> declined to consider whether African-American representation in

3

Iowa venires is fair and reasonable. Instead, it determined that Garcia failed to demonstrate that the jury-selection process systematically excluded African Americans from representation in jury pools, and thus, he failed to establish a prima facie violation. Id.

In rejecting Garcia's argument of systematic exclusion, our court introduced an element of intentional discrimination not required by the Supreme Court. Our court stated:

> Garcia does not contend that Iowa law imposes any suspect voter registration qualifications or that the Plan is administered in a discriminatory manner. Garcia has not made any showing that African Americans or Hispanics are systematically excluded from the jury-selection process. A numerical disparity alone does not violate any of Garcia's rights and thus will not support a challenge to the Iowa Plan.

Id. at 492. In contrast, the Supreme Court, in Duren v. Missouri, found a prima facie cross-section violation based largely on numerical evidence:

> [Petitioner's] undisputed demonstration that a large discrepancy occurred not just occasionally but in every weekly venire for a period of nearly a year manifestly indicates that the cause of the underrepresentation was systematic--that is, inherent in the particular jury-selection process.

439 U.S. at 366. See also, United States v. Perez-Hernandez, 672 F.2d 1380, 1384 n.5 (11th Cir. 1982) ("In a fair cross section analysis, purposeful discrimination is irrelevant since the emphasis is purely on the structure of the jury venire.").

In support of his constitutional challenge, Rogers presents the same numerical evidence of underrepresentation as presented to the court in Garcia and which our court declined to consider at that time. We now consider the evidence because we find it

4

probative of both the second and third <u>Duren</u> elements and because it buttresses our request for reconsideration of <u>Garcia</u>. According to the 1990 census, African Americans constituted 1.87% (31,656 out of 1,485,443) of the general population in the Central Division of the Southern District of Iowa. Yet only 1.29% (70 out of 5,424) were included in the petit jury pool in the Central Division from March 1987 through March 1992.

Comparing the number of African Americans in the general population with the number of those included in the jury pools, Rogers provides two separate calculations for the court: 1) the absolute disparity, which is the difference between the two figures (1.87 and 1.29), or 0.579%, and 2) the comparative disparity,[1] which is 30.96%. Although utilizing the absolute disparity calculation may seem intuitive, its result understates the systematic representative deficiencies; the percentage disparity can never exceed the percentage of African Americans in the community. Thus, in this case, even if African Americans were excluded entirely from the lists of potential jurors, the maximum disparity, under an absolute calculation, would be 1.87%. In the case of total exclusion, however, the comparative disparity figure would be 100%. While we recognize both figures provide a simplified statistical shorthand for a complex issue, the comparative disparity calculation provides a more meaningful measure of systematic impact <u>vis-a-vis</u> the "distinctive" group: it calculates the representation of African Americans in jury pools relative to the African-American community rather than relative to the entire population. <u>Contra</u> <u>United States v. Clifford</u>, 640 F.2d

_____

[1]The comparative disparity calculation is as follows:

$$\frac{\text{\% of African Americans in the population} \quad \text{less} \quad \text{\% of African Americans in the venires}}{\text{\% of African Americans in the population}} \times 100$$

150, 155 (8th Cir. 1981) (our court has declined to adopt the comparative disparity concept as a better means of calculating underrepresentation).  In this case, over a five-year period, Iowa's jury-selection system underrepresented the African-American community by over thirty percent.  In other words, a black was thirty percent less likely to be called to serve on a jury than if the composition of the source lists perfectly mirrored the community.

Interestingly, Rogers also states that if the jury-selection plan in Iowa randomly selected jurors from the entire citizenry, the probability of calling only 70 African Americans out of 5,424 potential jurors is less than 0.1%.  Although Rogers does not provide the calculation for this figure, the government does not dispute it and we take note of it as part of the record.  The extremely low probability that the underrepresentation would have occurred by chance alone provides futher evidence that the system itself contributed to the lack of African-American participation in the venire pools.

Defendant's statistics establish, at a minimum, a prima facie case that blacks are being systematically excluded from jury service in the Southern District of Iowa, and that, unless some justification is forthcoming, the system in place there does not comport with our constitution.  See Duren, 439 U.S. at 367-68.  Thus, this case warrants reconsideration by our court.[2]

---

[2]This author, writing for himself only, also encourages the Iowa federal district court to consider modifying its jury selection plan to increase minority representation in its jury pools.  A significant proportion of the defendants convicted in the Iowa federal courts are black:  as of November 4, 1995, nearly 22% (164 of the 756 federal prisoners) convicted in Iowa were black.  Yet, Iowa's use of voter lists has consistently produced jury pools that have few or no persons of color.  The government responds that the observed underrepresentation in Iowa jury pools is likely due to the fact that African Americans vote in a lower proportion than the rest of the population.  It

B.   Arraignment

Rogers also argues that his absence during his arraignment violated his Sixth Amendment right to be present at all criminal proceedings against him.  It is irrefutable that defendants have a constitutional right to be present at every stage of a trial.  See Illinois v. Allen, 397 U.S. 337, 343 (1970) (citing Lewis v. United States, 146 U.S. 370, 36 L.Ed. 1011, 13 S. Ct. 136 (1892)).  More specifically, Rule 43 of the Federal Rules of Criminal Procedure requires a defendant's presence at arraignment.  In this case, however, we consider Rogers' absence as a basis for reversal only if it constituted plain error because Rogers failed to properly preserve this issue in the court below.  See Fed. R. Crim. P. 52(b); see, e.g., United States v. Meeks, 857 F.2d 1201, 1203 (8th Cir. 1988).

---

further argues that our court has not recognized such a phenomenon as a constitutional violation.  See Clifford, 640 F.2d at 156 (citations omitted).  Nevertheless, the legislation governing the creation of jury-selection plans, the Jury Selection and Service Act of 1968, Pub. L. No. 90-274, § 101, 82 Stat. 54 (codified as amended at 28 U.S.C. §§ 1861-1869), requires plans to:

> prescribe some other source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights secured by sections 1861, [fair cross-section requirement] and 1862 [anti-discrimination] of this title.

28 U.S.C. § 1863(b)(2) (1984).  Several districts, including Minnesota, supplement their jury lists with persons who have a drivers license or a state identification card to increase minority representation.  The Iowa federal district courts should similarly supplement its jury lists.  See Cynthia A. Williams, Note, Jury Source Representativeness and the Use of Voter Registration Lists, 65 N.Y.U. L. Rev. 590 (1990) (arguing that courts should order supplementation of jury lists under the Jury Selection and Service Act to remedy underrepresentation of jury lists).

Where a defendant has had sufficient notice of the charges against him and an adequate opportunity to defend himself at trial, this court has held that an arraignment is not required. United States v. Cook, 972 F.2d 218 (8th Cir. 1992) (citing Garland v. Washington, 232 U.S. 642, 645 (1914) and United States v. Coffman, 567 F.2d 960, 961 (10th Cir. 1977)), cert. denied, 113 S. Ct. 991 (1993). In this case, Rogers was provided notice. At the time of his arraignment, Rogers had received two copies of the indictment; furthermore, his counsel explained to him the charges he faced and the importance of his appearance. Three months later, Rogers was present during a six-day jury trial, which provided him with ample opportunity to defend himself against the charges. Under Cook, a formal arraignment would be excused in this case. Moreover, we cannot say that Rogers' absence at his arraignment led to manifest injustice. We therefore affirm Rogers' conviction on this ground.

C.   Identification Procedures

Rogers further argues that the government's in-court identification procedures were impermissibly suggestive and unreliable because he was one of only a few African Americans present in the courtroom. Rogers only explicitly challenges the in-court identification by Shane Collins, a witness for the government who had been unable to identify Rogers in a photo array one week after the robbery yet pointed to Rogers in the courtroom. To sustain his claim, Rogers must demonstrate both that the government's questioning of Collins was impermissibly suggestive and that it created a "`very substantial likelihood of irreparable misidentification under the totality of the circumstances.'" See United States v. Murdock, 928 F.2d 293, 297 (8th Cir. 1991) (quoting Manson v. Brathwaite, 432 U.S. 98, 116 (1977)), cert. denied, 116 S. Ct. 260 (1995).

On cross-examination, Rogers' counsel placed the reliability and accuracy of the Collins' identification in context for the

8

jury: he highlighted that Collins had only seen the suspect fleeing across his backyard for a few minutes and that he could not identify Rogers in a photo lineup one week later. Rogers' counsel also noted that, other than a few persons sitting in the spectator gallery, Rogers was the only black in the courtroom. In addition to Collins' testimony, at least two other government witnesses identified Rogers, including Travis Hammers, Rogers' getaway driver. The additional testimony diminishes any likelihood of irreparable misidentification in this case. We therefore conclude that while Collins' identification of Rogers may have been tainted, we cannot say that the procedures used in this case violated Rogers' due process rights.

D.    Sufficiency of the Evidence

Finally, Rogers challenges the sufficiency of the evidence for his convictions. We can reverse the jury's determinations only if, after review of the entire record in a light most favorable to the government, a reasonable jury could not have found guilt beyond a reasonable doubt. See, e.g., Cook, 972 F.2d at 221. There was ample testimony at trial specifically connecting Rogers to the bank robbery at issue. Moreover, bank personnel testified as to the use of weapons during the robbery. Therefore, we do not upset the jury verdicts in this case.

III.   CONCLUSION

Accordingly, we affirm Rogers' convictions for bank robbery and the use of a firearm during the offense. But, in so doing, we encourage this court en banc to re-visit the issue of Iowa's jury-selection plan and the Iowa federal district courts to reform their jury plan to increase minority representation.

BEAM, Circuit Judge, concurring specially.

9

I concur in the result reached by the court and concur specifically in Parts I, IIB, IIC, IID and III of the court's opinion. I disagree with the contention that our opinion in <u>United States v. Garcia</u>, 991 F.2d 489 (8th Cir. 1993) violates the holding in <u>Duren v. Missouri</u>, 439 U.S. 357 (1979) or the Constitution. The purported underinclusion of the "distinctive group" in venires gathered under the Iowa jury selection plan results not from systematic exclusion of anyone but from an apparent underparticipation in voter registration and other election processes by the targeted classification.

Judge Heaney extols the virtue of Minnesota's program of supplementing the first stage venire assembly with names from drivers license lists and, possibly, "state identification card[s]," whatever this identification card list may amount to. While there is no evidence in the record one way or another, the reasons underlying voter apathy may also lead to disproportionate automobile registrations and, thus, fewer drivers license applications. In any event, the Motor Voter program in effect in Iowa very likely makes use of a drivers license list a redundant and unnecessary effort. <u>See</u> Iowa Code Ann. § 48A.18 (West Supp. 1995).

Judge Heaney does not place the source of the state identification cards he refers to. Unless the cards identify a reasonably universal group of citizens, the existence of which does not readily spring to mind, the suggestion would seem to run contrary to the idea of equal opportunity for jury service contemplated by <u>Duren</u> and the Constitution.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.