**UNITED STATES of America, Plaintiff,**

v.

**Salvador CORONELL–LEON, Defendant.**

**No. 4:96CR3053.**

United States District Court,
D. Nebraska.

July 15, 1997.

·Jeremy P. Murphy, Lincoln, NE, for Augustine Canizales–Gusman.

Robert W. Chapin, Jr., Lincoln, NE, for Salvador Coronell–Leon.

Douglas K. Wolgamott, Lincoln, NE, for Francisco Barraza–Canizales.

Robert W. Chapin, Jr., Carlos· A. Monzon, Lincoln, NE, for Isidro Perez–Coronel.

Bruce W. Gillan, Richard E. Rothrock, Asst. U.S. Attys., Lincoln, NE, for U.S.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This matter is before the court on the Magistrate Judge's Report and Recommendation (filing 50) and the objections to the Recommendation (filing 51), filed as allowed by 28 U.S.C. § 636(b)(1)(C) and NELR 72.4.

I have conducted, pursuant to 28 U.S.C. § 636(b)(1) and NELR 72.4, a de novo review of the portions of the Report and Recommendation to which objections have been made. Inasmuch as Judge Piester has fully, carefully, and correctly found the facts and applied the law, I need only state that the Recommendation (filing 50) should be adopted, the defendant's objections to the Recommendation (filing 51) should be denied, and the defendant's motion to dismiss the indictment due to an illegally constituted grand jury (filing 19) should be denied.

IT IS ORDERED:

1. the Magistrate Judge's Recommendation (filing 50) is adopted;

2.· the defendant's objections to the Recommendation (filing 51) are denied; and

3. the defendant's motion to dismiss the indictment due to an illegally constituted grand jury (filing 19) is denied.

## REPORT AND RECOMMENDATION

PIESTER, United States Magistrate Judge.

Pending before the court are the consolidated motions of the defendants to dismiss their indictments for illegal drug trafficking, on the ground .that the court's system for randomly selecting grand jurors is flawed.

In particular, defendants, both of whom are Hispanic, argue that this district's method of compiling its jury pool by means of voter registration lists results in the systematic underrepresentation of Hispanics in the jury pool. Upon consideration of the extensive documents and testimony adduced at an extensive evidentiary hearing in this matter, I shall recommend that the motions for dismissal of the indictments be denied. It is true that persons of Hispanic origin typically register to vote at a lower rate than nonhispanics; however, even if every reasonable factual dispute is resolved in favor of the defendants, the impact is too small to sustain a constitutional challenge.

## BACKGROUND

This court has long used voter registration as the means of forming its jury pool, and this practice is specifically contemplated by 28 U.S.C. § 1863, which governs plans for random jury selection.[1] Discrimination based on race, color, religion, sex, national origin, or economic status is prohibited. 28 U.S.C. § 1862. Voter registration is used because the lists automatically screen out many of those who are ineligible to vote (for instance, convicted felons or those under age eighteen) while it helps to provide a "random selection of a fair cross section of persons residing in the community." 18 U.S.C.§ 1863(b)(3); see United States v. Garcia, 991 F.2d 489, 491 (8th Cir.1993). If an additional source such as driver's licenses were used, the cost of administering the jury selection system would increase substantially because screening these lists would create significant administrative burdens.[2] (See Testimony of Gary McFarland, Transcript of

the Sanchez/Alvarez hearing in Omaha and Ex. 1.)[3]

The present system has been implemented as follows: The court's docket is informally divided into three "subdistricts" centered around the communities of Omaha, Lincoln, and North Platte. For each of the three subdistricts a master jury wheel is compiled using voter registration within each individual subdistrict. Thus, voters who reside within the North Platte subdistrict may be drawn as prospective jurors for cases tried in North Platte; voters who reside in the Omaha subdistrict may be drawn as prospective jurors for cases tried in Omaha; and voters who reside in the Lincoln subdistrict may be drawn as prospective jurors for cases tried in Lincoln. (See McFarland testimony at the Sanchez/Alvarez hearing.) During each presidential election lists of prospective jurors are formed for each of the subdistricts, by calculating the number of jurors likely to be needed and mailing out the appropriate number of juror questionnaires.[4] Thereafter, each month court officials estimate the number of petit jurors likely to be needed, and the names of prospective jurors are selected at random from the list and placed into the jury wheel. Unlike petit jurors, grand jurors are called from the entire state on a pro rata basis. Normally, at least one hundred names of prospective grand jurors are drawn, and from that number, twenty-three are selected for service. (Id.)

Among the information requested in the jury questionnaires is the race of the voter.[5] (Sanchez/Alvarez Ex. 2.) Five racial categories are listed on the questionnaires: "Black," "White," "American Indian," "Asian," and "Other (specify)." The words "Other (specify)" are followed by a blank in which a description can be written. The

1. The current plan was adopted by the district on February 18, 1989 and subsequently approved by the Judicial Council of the Eighth Circuit Court of Appeals on March 10, 1989. Under some circumstances 28 U.S.C. § 1863 authorizes the use of other lists to augment voter lists.

2. Moreover, supplemental lists have often proven ineffective in increasing minority representation in jury pools. John P. Bueker, Note, Jury Source Lists: Does Supplementation Really Work?, 82 Cornell L.Rev. 390 (1997) (examining data from the sixteen federal districts which have enacted supplementation programs and concluding that supplementation is not only ineffective but also quite costly).

3. The transcript and exhibits of another hearing challenging the system were entered into evidence upon stipulation of the parties in this case. (United States v. Gilberto Sanchez, 8:cr96:083, and United States v. Flores Alvarez, 8:cr96–001.)

4. The wheels are refilled at this time because voter registration typically increases during presidential elections.

5. This information is collected for statistical purposes and is not considered in forming the wheels.

questionnaire also asks, "Are you Hispanic? Yes/No." While this question is designed to invoke a response regardless of which race the prospective juror indicates, no instruction advises prospective jurors that they are expected to both check a racial category and answer the question regarding Hispanic: origin. (*Id.*) As a result, 16,680 persons failed to answer the question of whether they were hispanic.[6] Thus, it is uncertain exactly how many persons of each race requested actually occur in the master jury wheels.

The office of the Clerk of the Court has dealt with this problem by counting as nonhispanic all of the persons who did not answer the question. Consequently, the number of nonhispanics in the jury wheels almost certainly is overestimated in the district's statistics, because it is highly likely some prospective jurors of Hispanic origin became confused by the poorly drafted questionnaire and failed to answer the question of whether they were Hispanic. Moreover, as noted by defense expert Professor Miguel A. Carranza, for varying reasons some Hispanics do not want to be identified as hispanic and will either refuse to answer the question or answer it in the negative. As a result, the data exists in the light most favorable to the defendants, because it exaggerates to an unknown degree the number of nonhispanics in the pool and deflates to an unknown degree the number of Hispanics in the pool.

While the parties disagree on the amount of underrepresentation of Hispanics in the jury pool, the difference between their calculations is relatively minor. According to the defendant's calculations, the relevant proportions for the entire district are as follows:[7]

### Census Population Compared with Representation of Jury Wheels (State of Nebraska by Race)

| Race | % of Jury Wheels | % of Population |
|------|------------------|-----------------|
| White | 95.90% | 94.30% |
| Black | 2.10% | 3.10% |
| Hispanic | 0.92% | 1.60% |
| Others | 1.10% | 1.00% |

(Ex. 26.)[8] By defendants' calculation, when corrected for age, the absolute disparity between the number of Hispanics that reside in the state and the number of Hispanics included in the jury wheel is 0.75%. Absolute disparity measures the difference between the percent of Hispanics in the population as opposed to the percent of Hispanics in the jury wheel.[9] When corrected for age, the comparative disparity between the number of Hispanics that reside in the state and the number of Hispanics included in the jury wheel is 47.77%. Comparative disparity purports to measure the percentage by which

---

6. This included 7,816 persons in the Omaha subdistrict, 1,907 persons in the North Platte subdistrict, and 6,957 persons in the Lincoln subdistrict.

7. The defendants did not submit their raw percentages as to each individual subdistrict.

8. I note that the numbers which appear in some of defendants' exhibits conflict with their other exhibits. For example, the percentage of persons in the jury wheels is slightly different between exhibit 26 and exhibit 25. Moreover, with respect to the number of Hispanics in the population at large, only exhibit 26 has been corrected for age. Only the numbers that have been adjusted for age are relevant because citizens must be at least eighteen years of age to serve on a jury. *See* 18 U.S.C. § 1865(b) (*1* ); *United States v. Brummitt*, 665 F.2d 521, 529 (5th Cir.1981). The number of Hispanics in the population swells substantially if age is disregarded, which undoubtedly explains why defendants' exhibits often reflect those numbers instead of the corrected numbers. (*See, e.g.,* ex 28.) If age is disregarded, the disparity is much greater than if the numbers are adjusted. Thus, to compare "apples with apples" I have focused on only the adjusted data.

9. Absolute disparity is calculated by subtracting the smaller percentage from the large percentage. These numbers were calculated by the defendants' expert, Professor Steven L. Wise. I note, however, that they do not quite correspond

the probability of serving as a juror is reduced for people in a cognizable class.[10]

It is important to note that the U.S. Census data does not reflect those persons in each racial category who are ineligible to serve on a jury because they cannot speak or read English or have been convicted of a felony. *See* 28 U.S.C. § 1865(b)(5). For this reason the absolute and comparative disparities of both parties are likely skewed in an unknown direction. Further, the comparative disparity only measures the probability of being selected for a venire panel; in the context of petit juries, it does not account for such factors as attorney questioning during voir dire. Thus, it does not accurately depict the actual reduction of the chance that a specific Hispanic person will actually sit on any particular jury, as compared to the number of persons of Hispanic origin who reside in the community.

According to the government's calculations, the relevant proportions for the Lincoln subdistrict are as follows: [11]

*Census Population Compared with Representation*
*of Jury Wheels (State of Nebraska by Race)*

| Race | % of Jury Wheels | % of Population |
|------|------------------|----------------|
| White | 97.92% | 97.52% |
| Black | 0.55% | 0.86% |
| Hispanic | 0.75% | 0.96% |
| Others | 0.80% | 0.66% |

(Ex. 106.) [12] Lincoln has a lower minority population than Omaha and thus a lower proportion than the overall district. (*See* Sanchez/Alvarez exhibits.) By the government's calculation, when corrected for age, the absolute disparity between the number of Hispanics that reside in the Lincoln subdistrict and the number of Hispanics included in the jury wheel is 0.22%. The government's absolute disparity calculation for the entire district was 0.66%. When corrected for age, the comparative disparity between the number of Hispanics that reside in the Lincoln subdistrict and the number of Hispanics included in the jury wheel is 22.59%. The government's comparative disparity calculation for the entire district was 42.13%. Thus, the government's figures reflect lower degrees of disparity than the defense.

In addition to the disparity calculations, the government's expert, University of Nebraska Statistics Professor Dan Nettleson, also calculated the "substantial impact" of using voter registration lists. According to his calculations, in a randomly selected group of 200 prospective jurors from the entire district, 1.4 less persons of Hispanic origin would appear in the group than if a random group of 200 persons were drawn from the adjusted Census data. Moreover, in a randomly selected group of 200 persons from the Lincoln subdistrict, there would be 0.7 less persons of Hispanic origin than appear in the adjusted Census data. Therefore, the government argues that in real terms the actual impact of selecting jurors from voter registration lists is slight.

Professor Nettleson also prepared the following indices using both defense and government data:

| | Abs. Dis. Gov. | Abs. Dis. Def. | Comp. Dis. Gov. | Comp. Dis. Def. | Sub. Imp. Gov. | Sub. Imp. Def. |
|---|---|---|---|---|---|---|
| Nebraska | .66 | .75 | 42.3% | 47.9% | 1.3/200 | 1.4/200 |
| Omaha | .69 | .69 | 45.6% | 45.6% | 1.4/200 | 1.4/200 |
| Lincoln | .22 | .34 | 22.6% | 35.2% | 0.4/200 | 0.7/200 |
| N.Platte | 1.13 | 1.51 | 38.4% | 50.3% | 2.3/200 | 3.0/200 |

with the data as it appears in defendant's exhibits.

10. Comparative disparity is calculated by dividing the absolute disparity by the percentage population of the group.

11. The government broke the numbers into each of the subdistricts, but did not submit raw percentages for the entire district. It did prepare such a table using defense numbers, (Ex. 108), and it did make its own calculations of absolute disparity.

12. For the sake of simplicity I have rounded these numbers to the nearest hundredth of a percent.

(Gov's Brief at 5, summarizing Exhs. 104 and 109.) This chart is perhaps the most helpful means of comparing the specific figures used by the parties in this case.

## DISCUSSION

 Defendants seek to dismiss their indictments, claiming that forming the jury wheels from voter registration lists violates the Sixth Amendment right to a fair jury, the Fourteenth Amendment's right to equal protection, as well as the Jury Selection and Service Act, 28 U.S.C. § 1861 *et. seq.*[13] The elements of a Sixth Amendment challenge and a challenge brought under the federal statute are the same. *United States v. Miller,* 771 F.2d 1219, 1227 (9th Cir.1985); *United States v. Clifford,* 640 F.2d 150, 155 (8th Cir.1981). In order to demonstrate a prima facie violation of the Sixth Amendment and of the Jury Selection Act, defendants must demonstrate that (1) the group alleged to be excluded is a "distinctive group" in the community, (2) the representation of this group in venires from which juries are selected is not "fair and reasonable" in relation to the number of persons in the community, and (3) the underrepresentation is due to "systematic exclusion of the group in the jury-selection process." *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979). In order to prove an equal protection violation, the defendants must also prove that the underrepresentation occurred pursuant to a "discriminatory purpose." *Id.* at 368 n. 26, 99 S.Ct. at 670 n. 26.

### (1) Distinctive Group

 Although testimony presented at the evidentiary hearing demonstrates that the question is more problematic than it initially appears, I conclude for purposes of this motion that Hispanics constitute a distinct racial group in the community. *See Castaneda v.*

*Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) (finding that "Mexican–Americans" were a distinctive group in a Texas community); *United States v. Garcia,* 991 F.2d 489 (8th Cir.1993) (finding it "clear" that Hispanics are a "distinctive group in the community").[14] While persons in this group can have different cultural and linguistic traditions as well as different skin tones and even continents of origin, defendant's expert, University of Nebraska Sociology Professor Miguel A. Carranza, testified that those outside the group usually perceive Hispanics as belonging to one racial group and fail to distinguish between cultural and geographic differences among its members. Moreover, this is true for any racial/ethnic group. For example, different subgroups of American–Indians were and are distinct geographically, culturally, and linguistically, but are commonly perceived by outsiders as constituting one racial/ethnic group. Likewise, whites originate from a variety of linguistic and cultural backgrounds; they range from third or fourth generation immigrants from England to newly arrived immigrants from the reaches of the former Soviet Union. Thus, the argument that the traditions and geographic origins of Hispanics are too divergent to constitute a distinctive group is a red herring.

 "A group of people is distinct when they have a shared attribute that defines or limits their membership, and when they share a community interest." *United States v. Black Bear,* 878 F.2d 213, 214 (8th Cir. 1989). Hispanics have a common attribute in their South American, Mexican, and Spanish origins and often possess distinguishing physical features. In addition, while cultural and linguistic traditions may vary some between regions of geographic origin, those traditions and languages are much more similar to each other than to the traditions and

---

**13.** Defendants also allege a violation of the Fifth Amendment's right to indictment by grand jury; however, as they fail to explain in their brief how that is so, this claim has been abandoned and need not be discussed further. *See* NELR 7.1(a).

**14.** *But see United States v. Rodriguez,* 588 F.2d 1003, 1007 (5th Cir.1979) (finding Hispanics do not constitute a distinctive group); *United States v. Duran De Amesquita,* 582 F.Supp. 1326, 1328 (S.D.Fla.1984) (same).

languages of other groups in America. Professor Carranza also testified that Hispanics share similar concerns in the community.

In sum, common cultural, linguistic, and physical traits exist; people in the community view Hispanics as a distinct group; and many Hispanics view themselves as being a distinct group. Thus, it is reasonable that they should be treated as such for purposes of the Sixth Amendment. *See Garcia*, 991 F.2d at 491. I therefore conclude that defendants have met the first element of the *Duren* test.

### (2) Fair Representation

■ The second prong of Duren requires defendants to demonstrate that the representation of Hispanics in the jury pool is not "fair and reasonable" in relation to the number of Hispanics in the community. 439 U.S. at 364, 99 S.Ct. at 668. The relevant community consists of those Hispanics presumptively eligible to vote who reside in the District of Nebraska. *See Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S.Ct. 692, 701–02, 42 L.Ed.2d 690 (1975) (comparing the population "eligible for jury service"); *United States ex rel. Barksdale v. Blackburn*, 639 F.2d 1115, 1124 (5th Cir.), *cert. denied*, 454 U.S. 1056, 102 S.Ct. 603, 70 L.Ed.2d 593 (1981) (the relevant comparison is to the number of citizens of the community that are eligible to serve); *United States v. Haley*, 521 F.Supp. 290, 292 (D.Ga.1981) ("eligible population is preferable and provides a more accurate picture of representation"). *Cf. African American Voting Rights Legal Defense Fund, Inc. v. Villa*, 54 F.3d 1345, 1352–53 (8th Cir.1995) (relevant population for Voting Rights Act was "voting age population," not

total population). I conclude that defendants have failed to prove this element of their challenge to the grand jury system.

■ In order for a constitutional claim to lie, the underrepresentation of the group must be both continual and substantial. *Garcia*, 991 F.2d at 492.[15] "Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group." *Swain v. Alabama*, 380 U.S. 202, 208, 85 S.Ct. 824, 830, 13 L.Ed.2d 759 (1965). In *Swain*, the Court held that an absolute disparity of ten percent between blacks in the jury pool and those in the community did not constitute an unfair cross-section of the community. *Id.* at 208, 85 S.Ct. at 829–30. Furthermore, in *Garcia*, the Eighth Circuit ruled that an absolute disparity of less than 1% was insufficient to support a constitutional violation. *See also United States v. Clifford*, 640 F.2d 150 (8th Cir.1981) (absolute disparity of Native Americans of 7.2% did not violate the constitution).[16]

■ In this case, if the entire district is considered, the absolute disparity is either 0.66% or 0.75% depending on whose numbers are used.[17] The disparity in the Lincoln community is even less, 0.22% or 0.34%. Quite obviously, this degree of disparity is well below the level of disparity in both *Swain* and *Garcia*. To escape this difficulty defendants focus on the comparative disparity figures (22.6% to 35.2% for Lincoln; 42.3% to 47.9% for the district as a whole). Comparative disparity measures the reduced likelihood of a juror of a specific class appearing in the pool. I note, however, that it is clear

**15.** In *United States v. Rogers*, 73 F.3d 774, 777 (8th Cir.), *reh'g denied*, (Feb. 16, 1996), *cert. denied*, —— U.S. ——, 116 S.Ct. 1889, 135 L.Ed.2d 183 (1996), an Eighth Circuit panel affirmed based on *Garcia* the defendant's failure to prove a *Duren* claim, but in so doing Judges Heaney and McMillian commented that they believed *Garcia* should be overruled and that a small absolute disparity can justify a *Duren* claim. Although those judges suggested rehearing by the full circuit *en banc*, Roger's subsequent request for an *en banc* rehearing was denied. Further, Judge Beam argued that *Garcia* had been correctly decided and that the requirement of showing a systematic exclusion beyond a small numeric underrepresentation is appropriate. 73 F.3d at 778–79 (Beam, J., concurring).

Subsequently, another panel has applied *Garcia* and rejected the approach suggested in *Rogers*. *See Smith v. Copeland*, 87 F.3d 265, 269 (8th Cir.1996). As such, until the full court considers the issue, the comments of Judges Heaney and McMillian in *Rogers*, regardless of their merit, are not law and cannot guide this decision. *See Campbell v. Purkett*, 957 F.2d 535, 536 (8th Cir. 1992).

**16.** In contrast, *Duren* which did find a constitutional violation involved an absolute disparity of 40%. 439 U.S. at 365, 99 S.Ct. at 669.

**17.** Further, for the reasons noted above, these figures likely overestimate the disparity.

from *Swain* and *Garcia* that absolute disparity rather than comparative disparity is the decisive measure for constitutional purposes.[18] In addition, comparative disparity has been criticized because by its nature it shows "a greater degree of underrepresentation in situations in which the defendant's chances [of receiving an underrepresenative jury] have been affected to a lesser degree ..." Petre A. Detre, Note, *A Proposal for Measuring Underrepresentation in the Jury Wheel,* 103 Yale L.J.1913, 1914 (1994). *See, e.g., United States v. Hafen,* 726 F.2d 21, 24 (1st Cir.1984) (use of comparative disparity is inappropriate because it distorts the degree of underrepresentation of small groups).

■ When the percentages in this case are viewed in context, it becomes apparent that the actual significance of underrepresentation on jury panels is low. The district typically calls two hundred persons for jury service every month. According to Census data, in this number three persons of Hispanic origin should typically appear; by using voter registration one or two will typically appear. Furthermore, only a portion of these persons will actually serve as jurors. Under present Law, the difference between three persons in a venire of two hundred and one or two persons in a venire of two hundred is too insignificant to result in a constitutional violation. *United States v. Sanchez,* 8:CR96–083, slip. op. at 26 (D.Neb. April 4, 1997). *See also Garcia, supra; United States v. Jenkins,* 496 F.2d 57 (2d Cir.1974), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1119 43 L.Ed.2d 394 (1975). For these reasons, defendants motion for dismissal fails on the second prong of the *Duren* text.

### (3) Systematic Exclusion

■ Although defendants have failed to establish that the degree of representation of Hispanics on the jury pool is constitutionally significant, I shall briefly discuss their argument that jurors are systematically excluded. First, it is important to point out that in this case there is absolutely no evidence of purposeful discrimination in forming the master wheels. Second, the degree of absolute disparity in this case, especially that

in the Lincoln subdistrict, is so small that no inference of systematic exclusion can arise. *Garcia,* 991 F.2d at 492 (no inference of systematic exclusion where absolute disparity was less than 1%). Third, as stated by Judge Jaudezmis, "the decision of eligible persons not to register to vote, whatever their race or ethnicity, is not evidence of this district's systematic exclusion of those persons from its juries." *United States v. Sanchez,* 8:CR96–083, slip. op. at 29 (D.Neb. April 4, 1997). *See United States v. Test,* 550 F.2d 577, 587 n. 10 (10th Cir.1976) (all eligible citizens have equal access to vote and to sit on federal juries); *United States v. Freeman,* 514 F.2d 171, 173 (8th Cir.1975) (by using voter registration lists Congress intended to provide a "relatively large and easily accessible source of names" of prospective jurors).

### CONCLUSION

In summary, even ignoring the noted problems with the statistical information, and even if every reasonable factual dispute is resolved in favor of defendants, any resulting underrepresentation in the system is simply too slight to have constitutional significance, and there is no evidence of systematic exclusion of Hispanic jurors.

**IT THEREFORE HEREBY IS RECOMMENDED** to the Honorable Richard G. Kopf, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B), that the Defendant Salvadore K. Coronell–Leon's motion to dismiss, (filing 19), be denied.

**FURTHER, IT THEREFORE HEREBY IS RECOMMENDED** to the Honorable Warren K. Urbom, United States Senior District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B), that Defendant Isidro Perez–Coronel's motion to dismiss, (filing 12), be denied.

The parties are notified that unless objection is made within ten days after being served with a copy of this recommendation, they may be held to have waived any right

---

**18.** In *Rogers,* Judge Heaney argued that comparative disparity is the better measure. 73 F.3d at 776–77. While this argument may have some merit, I am bound to follow precedent.

they may have to appeal the court's order adopting this recommendation.

June 17, 1997